NOT DESIGNATED FOR PUBLICATION

No. 114,038

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of:
L.S.M.A., DOB: 2012, Sex: F;
J.R.P.A., DOB: 2010, Sex: M; and
N.W., DOB: 2007, Sex: M.

MEMORANDUM OPINION

Appeal from Ford District Court; SIDNEY R. THOMAS, judge. Opinion filed April 8, 2016. Affirmed.

*Louis A. Podrebarac*, of Podrebarac Law Office, of Dodge City, for appellant natural father.

*Sarah Doll Heeke*, of Doll Law Firm, LLC, of Dodge City, for appellant natural mother.

*Kathleen Neff*, assistant county attorney, and *Natalie Randall*, county attorney, for appellee.

Before HILL, P.J., PIERRON and GARDNER, JJ.

*Per Curiam*: D.C., Mother, and J.A., Father, are the natural parents of N.W. born in 2007, J.R.P.A. born in 2010, and L.S.M.A. born in 2012. The State took custody of the children on October 16, 2013. The district court held a termination hearing on May 18, 2015. The court terminated Mother's and Father's parental rights. Both parents appeal.

On October 11, 2013, Dodge City police officers responded to a report of a child pointing a gun at passing cars. The police found N.W., a 6-year-old boy, holding an unloaded CO2 BB gun that was not easily identifiable as a toy. N.W. was dirty and not wearing a shirt or shoes. After speaking to N.W. for a period of time, the officers were able to figure out his address and who his mother was. The officers went to the family

1

residence and spoke with Mother. Mother claimed to have seen N.W. 10 minutes prior even though N.W. had been in police custody for 30 to 45 minutes by that point. One of the officers testified the other children in the home were not as dirty as N.W., and N.W. could possibly have gotten dirty from playing outside for an extended period of time.

Mother appeared to be under the influence of a central nervous system stimulant. The officers asked her if she was on anything, and she told them she had smoked some marijuana and methamphetamines. An officer contacted Mother's probation officer who responded to the scene and put an arrest and detain order on her. Mother was arrested and taken into custody. Father was already incarcerated at the time.

On October 16, 2013, the district court removed N.W., J.R.P.A. and L.S.M.A. from the home and placed them in the custody of the Kansas Department for Children and Families (DCF) because both parents were incarcerated and the children had no supervision. On December 18, 2013, the court adjudicated the children as Children in Need of Care (CINC). Both Mother and Father entered no contest statements at the CINC adjudication.

Tammie Patterson, a reintegration supervisor for Saint Francis Community Services (SFCS), testified the children had a number of health and behavioral issues when they came into custody. J.R.P.A. had several rotten teeth, which took several dentist appointments to correct. Patterson noted his case was particularly severe and was indicative of long-term neglect in the home. J.R.P.A. also had a heart murmur which required a doctor's visit. L.S.M.A. was over the age of one but still drank from a bottle and was possibly a little behind on her social skills. N.W. was physically aggressive and struggled with lying and stealing.

The first case plan conference was on November 5, 2013. Patterson testified that neither Mother nor Father attended because they were still in jail, and jail policy

prevented them from participating. SFCS informed Mother of the case plan and her tasks on November 20, 2013. SFCS informed Father of the case plan and his tasks on December 10, 2013.

*Natural Mother*

According to Patterson, Mother was released from jail on November 7, 2013 and made contact with SFCS soon after. On December 6, 2013, SFCS reported Mother was actively searching for a job. She had completed a drug and alcohol evaluation on November 6, 2013, and had clean initial drug tests. She had completed a mental health evaluation on November 27, 2013 and was attending therapy. She also had two separate visits with her children on November 16, 2013, and November 27, 2013.

On December 6, 2013, Mother entered Ashby House, a drug and alcohol inpatient treatment facility in Salina. SFCS also assigned Rodney Taylor as the regular caseworker for her on the same day. Taylor testified Mother had two 3-hour visits with her children during her time at Ashby House, one on December 19, 2013, and another on December 30, 2013. She also had an overnight visit on January 11, 2014. This was the last visit, however, because Mother left Ashby House to live in a motel with her adult son. She did not notify SFCS she had left the program. According to Taylor, he discovered she had left when he called to speak with her at Ashby House.

Taylor testified he was in Salina on January 30, 2014, for training and attempted to set up a worker/parent meeting with Mother. He called her several times, but she did not answer her phone or return his calls until he offered to buy her dinner. At the meeting, Taylor went over Mother's case plan tasks with her. According to Taylor, Mother was not making any significant progress at the time. She said she was looking for a job but had not applied anywhere yet. Because she had walked away from Ashby House, she was no longer following the recommendations from her drug and alcohol evaluation. When

3

Taylor asked about her adult son, Mother told Taylor he was one of four children she had lost legal custody of when she had gone to jail in California.

Taylor told the district court that Mother eventually entered the Central Kansas Foundation (CKF), an intensive inpatient drug and alcohol treatment program, on February 24, 2014. Completion of the CKF program was a precondition for returning to Ashby House. CKF did not allow visits with the children, so Mother was only able to have one phone visit during this time. She completed the CKF program and returned to Ashby House on March 19, 2014.

During her second stay at Ashby House, Mother had weekly visits with her children from April 12, 2014, until May 25, 2014. The visits were originally unsupervised, but SFCS changed the visits to supervised because J.R.P.A. had returned from a visit with bruises on his chest. SFCS believed the bruises were caused by N.W. hitting J.R.P.A. On May 25, 2014, Ashby House discharged Mother for rule violations. She did not complete the Ashby House program.

After Mother's discharge from Ashby House, SFCS had difficulty locating her. On June 6, 2014, SFCS was able to contact Mother and she said she was living with a friend. Sometime after June 6, Mother gave SFCS an address, which Taylor understood as 150 "Ace" Street. SFCS attempted an in-home visit at the address on June 17, 2014, but could not find the home. SFCS may possibly have misheard the address. On June 20, 2014, Mother gave her address again, which SFCS took down as 150 "8th" Street. SFCS did not attempt another visit at this address.

The next worker/parent meeting with Mother was on July 16, 2014, at a permanency hearing. By this point, Mother was living in another motel. She provided a receipt to the district court as evidence of where she was living, but the receipt did not have the motel's name or address. Mother reported she had been working at a restaurant

4

for about 3 weeks. At the hearing, the court found Mother's progress on the permanency plan was not adequate and reintegration was no longer viable.

In August, SFCS had an address for Mother at an Embassy Suites motel. In September, Mother was living with a boyfriend in a home in Salina. She stayed there for 2 months then moved back into a motel.

Taylor testified Mother's visits with her children were contingent on her passing drug screens. She was originally allowed weekly visits, but after the district court found reintegration was no longer a viable option in July 2014, she was only allowed visits once a month. She had negative drug tests on June 24, July 2, and July 8. Between July 8 and September 5, she failed to show up for all 7 of her drug tests. On September 5, she had a negative drug test. On September 9, she did not show for her drug test. On September 23, she tested positive for THC. She had one visit in October and one visit in November. From December until the time of the termination hearing, Mother had not had any visits with the children because she had stopped taking the drug tests.

As of the termination hearing, Mother had only completed some of her case plan tasks—a drug and alcohol evaluation, a mental health evaluation, and a parenting class. She had not followed all the recommendations from her drug and alcohol and mental health evaluations. Mother had temporarily lost the job she had in July but got it back in November 2014 and had been working there since. She had not sent in recent pay stubs as required, however. Mother was in arrears of $9,560.10 on child support and had not made any payments. She had not found safe and stable housing. She had not reported changes in her address, phone number, and employment within 24 hours to SFCS. Taylor testified that Mother was not in a position to raise her children now or in the near future.

*Natural Father*

After being arrested on September 23, 2013, Father eventually pled to aggravated robbery. The incident leading to his arrest involved a stabbing, and the State originally had charged him with attempted murder. He served 16 months in prison during the pendency of this case. This was his fourth felony conviction. He had prior convictions for second-degree burglary and possession of methamphetamines. He served time in prison for all three of his prior felonies.

Detective David Gordon, with the Dodge City Police Department, also testified at the termination hearing. He had filled out a Gang Verification Criteria form for Father in relation to a disorderly conduct incident in 2010. At the time, Father told Gordon he was a member of a "white Nazi gang." Gordon testified Father had a "peckerwood" tattoo which substantiated his claim of gang membership. Father denied membership in a gang. He testified he did not recall speaking with Detective Gordon because he had been drunk and had put his head through a windshield.

Father had an extensive history of drug use as shown in his drug and alcohol evaluation. He began using methamphetamines at the age of 17. He denied ever using them regularly, but he admitted methamphetamine use had "'most definitely'" affected his relationships. The last time he used methamphetamines was September 22, 2013, the day before his arrest. He began using heroin daily at the age of 20 and had a history of withdrawal symptoms. He reported the last time he used heroin was in 2012. He believed it had been a problem for him, but it was not any longer. According to Father, heroin use did not affect his relationships other than taking him away from his family. He first drank alcohol at the age of 15, but he did not believe it was ever a problem. The last time he drank alcohol was the day of his arrest. He had drunk about a quart of alcohol to help him come down off a methamphetamine high. Father reported he had completed a drug treatment program through the California Department of Corrections in 2000. He also reported being in another drug treatment program in prison in 2014, but he did not complete it due to an altercation with another inmate.

Taylor testified Father could have completed some tasks from his case plan while incarcerated, but he chose not to do so. These tasks included the drug and alcohol evaluation and the mental health evaluation. According to Father, he did complete a drug and alcohol evaluation and a mental health evaluation during his time in custody. The Kansas Department of Corrections, however, was unwilling to share the results of these evaluations with SFCS. Father also started a parenting class while incarcerated, but he was kicked out for disciplinary reasons.

During his time in prison, Father wrote two or three letters to each of his children. He testified he would have had phone visits with his children if he had known that was an option. He testified he was in contact with Taylor several times during his incarceration. He wrote letters to the Assistant Ford County Attorney and two judges in an attempt to get more information about his case. After being released from prison on February 2, 2015, Father had one visit with his children. He testified he let the children "roughhouse[]" a little bit, and J.R.P.A. got a bloody nose. According to Father, he felt he had been a little "lax[]" and should have set some boundaries with the children.

After being released from prison, Father had made notable progress on his case plan. He completed a mental health evaluation, which did not recommend any further mental health care. He completed a drug and alcohol evaluation. In compliance with its recommendations, he was in a treatment program at CrossOver Recovery, and there had been no reports of a positive drug test. He was taking a required parenting class at the time of the termination hearing and had taken a domestic violence class, which was not required by his case plan.

Father had been working full-time for 6 weeks as a welder. He testified he woke up at 3 a.m. and biked 9 miles to get to work by 6 a.m. He was still homeless and staying at the Union Rescue Mission and appeared to be having no problems there. Father

7

testified he had saved $700 in hopes of getting a home and a car and would be able to care for his children. Father was in arrears of $4,451.20 on child support, but he had received a credit of $2,000 for participating in a forgiveness program.

According to Patterson, Father had definitely made progress since he had gotten out of jail, but because of his incarceration his plan had not been reasonably completed as of the date of the termination hearing. In her opinion, the children could not be put safely with the Father at the current time. Given the length of time the children had already been out of the home, they could also not be placed with him in the foreseeable future measured in child's time.

Taylor testified Father was not anywhere near ready to take care of the children. According to Taylor, he was primarily looking for stability, and Father had not had much time to demonstrate he could be stable. While he hoped Father would continue to progress, Taylor's experience was people in Father's position often fail to follow through. In Taylor's opinion, the best case scenario is Father would be ready in 6 to 9 months, but the children need permanency now. If Father stumbled, it could take even longer for him to be ready to resume custody.

The district court held a termination hearing in March 2015. Father was present and Mother appeared by phone. The electronic recording system failed at that hearing, however, so a second hearing was held in May 2015. Father was present at the termination hearing, but Mother was not. Mother had e-mailed her attorney to say she would not be able to attend because of work.

In its ruling at the termination hearing, the district court found that Mother and Father were unfit under nine factors listed in K.S.A. 2014 Supp. 38-2269, and their conduct or condition was unlikely to change in the foreseeable future. It also applied a

8

presumption of unfitness to Mother. The court determined termination of parental rights was in the best interests of the children. Both Mother and Father appeal.

When this court reviews a district court's termination of parental rights, it considers "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that [the parent's rights should be terminated]." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008). In *B.D.-Y.*, the court explained that "clear and convincing evidence" requires the factfinder to believe "that the truth of the facts asserted is highly probable." 286 Kan. at 697. Appellate courts do not weigh conflicting evidence, determine the credibility of witnesses, or redetermine factual questions. 286 Kan. at 705.

After a district court has adjudicated a child to be a CINC, the district court must make three findings before terminating parental rights. The court must find by clear and convincing evidence that (1) the parent is unfit; (2) the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future; and (3) the termination of parental rights is in the best interests of the child. K.S.A. 2015 Supp. 38-2269(a), (g)(1); *In re M.H.*, 50 Kan. App. 2d 1162, 1169, 337 P.3d 711 (2014). When deciding whether the parent is unfit, the district court must consider a nonexclusive list of factors in K.S.A. 2015 Supp. 38-2269(b). When the child is not in the parent's custody—which is the case here—the district court must also consider four additional factors listed in K.S.A. 2015 Supp. 38-2269(c). Any one of these factors, standing alone, may provide grounds for termination. K.S.A. 2015 Supp. 38-2269(f). A court may presume a parent is unfit if clear and convincing evidence demonstrates "the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." K.S.A. 2015 Supp. 38-2271(a)(5).

In making its determination of unfitness, the district court relied on the following factors:

1. K.S.A. 2015 Supp. 38-2269(b)(1), "[e]motional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child," as to Mother;

2. K.S.A. 2015 Supp. 38-2269(b)(3), "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child," as to both parents;

3. K.S.A. 2015 Supp. 38-2269(b)(4), "physical, mental or emotional abuse or neglect or sexual abuse of a child," as to both parents;

4. K.S.A. 2015 Supp. 38-2269(b)(5), "conviction of a felony and imprisonment," as to Father;

5. K.S.A. 2015 Supp. 38-2269(b)(7), "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family," as to both parents;

6. K.S.A. 2015 Supp. 38-2269(b)(8), "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child," as to both parents;

7. K.S.A. 2015 Supp. 38-2269(b)(9) and (c)(1), child is in extended out of home placement as a result of actions attributable to parent and parent failed to assure care of child in parental home, as to both parents;

8. K.S.A. 2015 Supp. 38-2269(b)(9) and (c)(2), child is in extended out of home placement as a result of actions attributable to parent and parent failed "to maintain regular visitation, contact or communication with the child or with the custodian of the child," as to both parents;

10

9. K.S.A. 2015 Supp. 38-2269(b)(9) and (c)(3), child is in extended out of home placement as a result of actions attributable to parent and parent failed "to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home," as to both parents;

10. K.S.A. 2015 Supp. 38-2269(b)(9) and (c)(4), child is in extended out of home placement as a result of actions attributable to parent and parent failed "to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay," as to both parents.

## NATURAL MOTHER

Mother argues clear and convincing evidence does not support the district court's findings as to any of the above factors. She argues she properly cared for the children and was mostly in compliance with the case plan. Mother contends any failures on her part are due to mutual communication problems with SFCS. She also asserts her recent changes demonstrate she would be fit to parent her children in the foreseeable future.

The State argues the district court made detailed findings regarding the K.S.A. 2015 Supp. 38-2269 factors in Mother's case. These cumulative factors, coupled with a presumption of unfitness under K.S.A. 2015 Supp. 38-2271(a)(5), demonstrate Mother was unfit and would remain unfit for the foreseeable future.

In the present case, sufficient evidence supports the district court's finding that Mother was unfit. Regarding Mother's drug use, she admitted she was under the influence of marijuana and methamphetamines when the children were initially taken into custody on October 11, 2013. She completed a drug and alcohol evaluation as part of her case plan, but she failed to fulfill its recommendations. She entered Ashby House but left voluntarily before completing the program. She completed the CKF drug treatment program as a precondition to being readmitted to Ashby House, but Ashby House later

11

involuntarily discharged her for rule violations. In her brief, Mother correctly notes she only had one positive drug test during the pendency of the case, but she fails to mention she did not show up for many of her scheduled UAs.

Regarding Mother's neglect of the children and failure to assure care of the children in the parental home, this was demonstrated by their condition when they entered State custody. On October 11, 2013, N.W. was found dirty, shirtless, and shoeless blocks from home pointing a realistic toy gun at cars. At the time, Mother was under the influence of narcotics and did not know N.W. was not at home. After being taken into custody, N.W. continued to demonstrate behavioral issues. J.R.P.A. had severe dental issues that Patterson testified were uncommon and demonstrated long-term neglect. L.S.M.A. was also still drinking from a bottle at the age of one.

Turning to her inability to adjust her circumstances to meet the children's needs, Mother was unable to maintain a stable home during the pendency of the case. She frequently moved and stayed in motels. She was eventually able to secure a job but was never able to make any child support payments. She was also not compliant with the recommendations of her drug and alcohol and mental health evaluations.

As for Mother's failure to maintain regular visitation or communication with her children or the custodian of her children, Mother was only able to maintain regular visitation with her children for sporadic periods. In her brief, Mother argues many of these missed visits were due to factors outside her control. She asserts she could not have visits with her children while at CKF due to CKF policy. The only reason Mother was at CKF, however, was because she had left Ashby House before completing treatment. Mother also missed many visits because she did not show up for her required drug tests. Mother contends she could not take the required drug tests due to transportation issues, and this prevented her from visiting her children. Mother was not present at the termination hearing, though, and any evidence of transportation issues was not presented.

Her attorney's questions at the hearing may have implied this might have been an issue, but Taylor testified he did not know of any such issue. Mother also argues SFCS refused to allow visits while she was living in a motel. Taylor testified at trial, however, that while SFCS did not allow visitations in motels, visitations were still possible. Admittedly, one missed visit appears to be due to a miscommunication of an address, but the children were in State custody for over a year, and for much of this time Mother was entitled to weekly visits.

Clear and convincing evidence also supports the district court's finding that SFCS's reasonable efforts to rehabilitate the family failed. SFCS developed a case plan for Mother to follow and went over the case plan tasks with her. SFCS attempted to have regular meetings with Mother to review her progress. Mother argues in her brief that SFCS was required to have monthly face-to-face worker/parent meetings with her. Because these meetings often either did not happen or took place over the phone, SFCS did not use reasonable efforts to rehabilitate the family. SFCS, however, had difficulty staying in contact with Mother throughout the case. Taylor testified he was frequently unable to reach Mother by phone. Mother was also reportedly frustrated with her inability to get in touch with SFCS workers. Taylor met with Mother in October 2014 to discuss communication issues, but Taylor felt communication did not improve after this meeting. In April 2015, SFCS switched to communication primarily through e-mail at the order of the district court but still had trouble getting in touch with Mother. Mother did not initiate contact by e-mail or return SFCS's e-mails.

There is also clear and convincing evidence Mother failed to carry out a reasonable plan directed toward reintegration. As mentioned above, she completed a drug and alcohol evaluation but did not complete her drug treatment at Ashby House and she missed a number of required drug tests. She also completed a mental health evaluation and a parenting class as part of her case plan. She did not follow through with the recommendations of her mental health evaluation, though. In addition, while she

completed her parenting class, she frequently canceled her scheduled visits for the class. She did not fulfill her obligation to notify her caseworker of any change in address within 24 hours, making it difficult for SFCS to stay in contact with her and arrange visits. While she had found a job, she had not provided recent documentation of her employment as required by her case plan. She had also not made any child support payments of any amount despite being in arrears of over $9,000.

The only factor which does not appear to be supported by clear and convincing evidence is Mother's emotional or mental illness. In its oral ruling, the district court stated, "There is not much evidence of that, but there is evidence that the mother struggled with emotional illness. I would call it inability to cope with the situation, and that just affected her ability to provide ongoing needs of the children." There was no evidence presented at the hearing of an actual diagnosis regarding her mental or emotional state. Thus, while Mother may have been suffering from some mental health issues, it was not highly probable based on the evidence presented at the hearing.

The district court also applied a statutory presumption of unfitness to Mother. Under K.S.A. 2015 Supp. 38-2271(a)(5), a court may presume a parent is unfit if clear and convincing evidence establishes that "the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home." Mother does not address the statutory presumption in her brief, and the State only mentions it briefly in support of its argument that the court properly found Mother unfit. Because clear and convincing evidence supports the court's finding without the presumption, however, we need not address it.

Not only was Mother currently unfit, her conduct or condition was unlikely to change in the foreseeable future. Courts view the "foreseeable future" element through

14

the child's perspective rather than the parents'. *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). This court must decide these cases in "'child time'" rather than "'adult time'" so that children do not languish in State custody. *In re J.A.H.*, 285 Kan. 375, 386, 172 P.3d 1 (2007). This court may predict parents' future unfitness based on their past conduct. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re J.T.J.*, No. 112,345, 2015 WL 2414453, at *16 (Kan. App. 2015) (unpublished opinion), *rev. denied* 302 Kan. ___ (July 21, 2015).

As of the time of the termination hearing, Mother had made limited progress on her case plan. She had failed to complete her drug and alcohol treatment and had missed a number of required drug tests. She was not maintaining regular visitation with her children or staying in contact with SFCS. She had not found a stable home. She had found a job, but in her 6 months of employment she had not made any child support payments. At the time of the hearing, her children had been in State custody for over a year and a half, but her behavior did not show any significant changes which would suggest she would soon be ready to resume custody of her children. Based on her past conduct, clear and convincing evidence supports the court's finding that Mother's condition was unlikely to change in the foreseeable future.

## NATURAL FATHER

Father argues that clear and convincing evidence does not support the district court's finding that he is unfit. He primarily argues that since his release from prison he has substantially complied with his case plan. Father has expressed a willingness to permanently change his bad habits and has been working hard to prepare himself to raise his children. The State asserts evidence of Father's history of drug use and criminal behavior, along with evidence relevant to other factors, support the court's finding of unfitness.

15

While Father had made progress on his case plan since being released from prison, sufficient evidence supports the district court's finding that Father is unfit. He has a long history of drug use. He began using drugs when he was 17 years old and was 51 years old at the time of the hearing. While he had been drug free for almost 2 years at the time of the hearing, he had been incarcerated for the majority of that time and was currently enrolled in a treatment program. This was not his first time in a treatment program for drug abuse, and he had relapsed before.

Not only was Father incarcerated for a felony during the pendency of this case, he has a significant criminal history. He has three prior felony convictions and has served prison time for all three. During the pendency of this case, he served 16 months for a fourth felony conviction. He was on a 3-year term of postrelease supervision at the time of the termination hearing.

As for failure of reasonable efforts by the appropriate authorities, Father did attempt to avail himself of some opportunities during his time in prison. He enrolled in a parenting class; however, he was kicked out of the class for disciplinary reasons. Taylor also testified Father had failed to get drug and alcohol and mental health evaluations done while incarcerated. Father testified he had both evaluations done, but KDOC would not share the results. The district court appears to have accepted Taylor's testimony, however, and we do not reweigh conflicting evidence.

As for lack of effort to adjust circumstances, the district court pointed out that Father had a long criminal history and was fully aware of the kind of conduct that would take him away from his children, yet he chose to engage in it anyway when he committed the robbery for which he was convicted. While in prison, Father also had some disciplinary issues which got him kicked out of a parenting class.

16

The district court found Father had failed to maintain regular visitation or communication with the children or with SFCS. During his time in prison, Father wrote two or three letters to each of his children. He also wrote at least two letters to his SFCS caseworker. Father had visited with the children once since being released in February. He did not have a visit in February at the request of his SFCS caseworker. While Father was able to maintain much better contact with his children and SFCS once he was out of prison, the court felt this demonstrated a lack of effort while Father was in prison.

Since being released from prison, Father had been in compliance with his case plan. He had gotten his mental health and drug and alcohol evaluations and was following any recommendations. He had found a full-time job. He was taking the required classes. Father still did not have a home, however, and by his own admission he did not have the resources to start caring for his children immediately. He had started saving money instead of applying it to the child support which he owed. Furthermore, he had only been out of prison for a short period of time at the time of the termination hearing, so he had been unable to demonstrate that any changes he had made would be long-lasting. Thus, looking at the evidence in the light most favorable to the State, Father continued to be unfit at the time of the termination hearing.

Clear and convincing evidence also supported the district court's finding that Father's condition was unlikely to change in the foreseeable future. While Father had made progress on his case plan since being released from prison, he himself admitted he did not have the means to take care of his children immediately. Patterson testified that Father would not be able to assume responsibility for the children within the foreseeable future measured in child's time. Taylor testified Father was nowhere near ready to take care of the children, and the soonest he could be ready was 6 to 9 months. If Father had any mistakes or slip-ups, it could take even longer. Father clearly was making a commendable effort to reform himself; however,

"[a] parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, which may be the case here. But we must judge these cases based mostly upon actions, not intentions, and we must keep in mind that a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

Considering the children had been in State custody for over a year and a half at the time of the termination hearing, sufficient evidence demonstrated Father would not be ready to assume custody of the children within a reasonable time from a child's perspective.

Mother and Father both argue the district court erred in its best interests of the child analysis because it did not weigh the benefits of the presence of the parent against permanency for the children without the parent. They claim the court's failure to do so resulted in reversible error. The State contends the court properly considered the best interests of the children in its ruling, and the evidence supported its decision.

The proper standard of review for the best interests determination in a termination hearing is abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903, (2014). A district court abuses its discretion when its decision is (1) arbitrary, fanciful, or unreasonable, (2) based on an error of law, or (3) founded on an error of fact. *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013). When determining whether termination was in the child's best interests, courts must give primary consideration to the child's physical, mental, and emotional health. K.S.A. 2015 Supp. 38-2269(g)(1).

Here, in deciding that termination was in the best interests of the children, the district court cited the correct legal standard under K.S.A. 2015 Supp. 38-2269(g)(1)— that the court give primary consideration to the physical, mental, and emotional health of the child. The court then noted the children had been out of the home for a long time and

18

needed placement soon. Both Patterson and Taylor testified at trial that the children needed permanency soon, and Taylor testified neither parent was in a position to care for the children now or in the near future. Patterson expressed the same view when asked about Father's present and future ability to care for the children. Based on the evidence presented at trial, a reasonable person could agree that termination of both Mother's and Father's parental rights was in the best interests of the children. Thus, the court did not abuse its discretion, and its decision to terminate the parental rights of Mother and Father is affirmed.

Both Mother and Father argue the district court erred because it failed to explicitly weigh the benefits of the continued presence of the parent against permanency for the children without the presence of the parent as required by law. K.S.A. 2015 Supp. 38-2269(g)(1), however, does not require the district court to make specific findings on the record when deciding if termination is in a child's best interests. It only requires courts to consider the statutory criteria. *In re K.G.*, No. 112,115, 2015 WL 3514169, *11 (Kan. App. 2015) (unpublished opinion). In this case, the district court stated the statutory criteria in its oral ruling. Furthermore, the journal entry of judgment reiterates the statutory criteria. See *In re M.T.S.*, No. 112,776, 2015 WL 2343435, *9 (Kan. App. 2015) (unpublished opinion) (finding written journal entry's statement that termination was in the best interests of the child "[c]onsidering the physical, mental or emotional health of the child" was sufficient to comply with K.S.A. 2014 Supp. 38-2269[g][1]). Because the district court identified and applied the correct statutory criteria, there was no error.

Affirmed.

19